CALABRIA, Judge.
*119 Respondent appeals from the trial court's order awarding guardianship of her minor child, "James,"[1] to his paternal grandfather, Harold Outing ("Mr. Outing").[2] After careful review, we affirm.
I. Background
On 13 March 2013, Mecklenburg County Department of Social Services, Division of Youth and Family Services ("YFS") received a referral alleging that a domestic violence incident had occurred between respondent and her boyfriend, the father of two of respondent's other minor children. The incident caused respondent's C-section stitches to break, and the boyfriend was charged with assault on a female. The charge was later dismissed, but YFS entered into safety plans with both respondent and her boyfriend.
Respondent and her children initially stayed with respondent's mother following the incident, but two weeks later, they moved in with the boyfriend, his mother, and his seventeen-year-old sister. On 17 June 2013, YFS received a referral alleging that James's three-month-old half-sister, "Charlene," had been sexually abused. Charlene was hospitalized for three days.
YFS and respondent entered into another safety plan, which required that she and her children return to their maternal grandmother's home. The maternal grandmother was to provide constant "eye/sight"
*120 supervision of the children, and she and respondent agreed that they would not engage in violence in front of the children. However, on 15 July 2013, YFS received reports alleging that respondent and her mother had engaged in multiple acts of domestic violence in the children's presence. Respondent was charged with damage to property and violation of a domestic violence protective order as a result of the incidents. The maternal grandmother told YFS that she was "overwhelmed" and could only provide care for the children through 16 July 2013.
On 17 July 2013, YFS filed a petition alleging that James and his half-siblings were abused, neglected, and dependent juveniles. YFS obtained nonsecure custody of the children and placed them in a foster home. An adjudication hearing was conducted on 18 September 2013, and respondent stipulated to a number of facts. Based on those stipulations, the trial court adjudicated the children as neglected and dependent.
Prior to the dispositional phase of the hearing, Mr. Outing, represented by counsel, moved to intervene in the case. Mr. Outing stated that James had lived with him "on and off" since birth and "exclusively ... from approximately June 2011 until June 17, 2013." According to Mr. Outing, he had served as James's primary caretaker for two years, during which he provided James with a bedroom, food, clothing, shoes, and other necessities; took him to and from preschool each day; tucked him into bed each night; and cared for him when he was sick. Mr. Outing explained that when he left town to travel for work in June 2013, he left James in respondent's care. However, when he returned home approximately one month later, he was informed that James and his half-siblings were in YFS custody.
*650 The trial court granted Mr. Outing's motion to intervene and proceeded to disposition. The children were ordered to remain in YFS custody, and respondent was awarded supervised visitation. The court ordered YFS to conduct a home study of Mr. Outing's residence and to explore and develop a case plan with him. The court awarded Mr. Outing weekly supervised visitation with James and gave YFS "discretion to expand visitations."
Respondent returned to her mother's residence, and she and her boyfriend continued to have issues with domestic violence. Respondent made inconsistent progress with her case plan, making incomplete attempts at substance abuse treatment and sporadically testing positive for various drugs; spending time in jail on a variety of criminal charges; complying inconsistently with court-approved visitation and safety plans; and cycling through multiple jobs and living arrangements. James *121 continued to have visitation with Mr. Outing during this timeframe, except for a few periods when visitation was briefly suspended. With the trial court's permission, on 15 June 2015, YFS officially placed James in Mr. Outing's residence full-time.
On 19 April 2016, the trial court entered an order requiring respondent, Mr. Outing, and YFS to schedule a meeting to discuss guardianship of James. Respondent failed to attend that meeting due to a work conflict. Following the next permanency planning hearing, on 9 May 2016, the court entered an order concluding, inter alia , that guardianship was in James's best interest and awarding guardianship to Mr. Outing.[3] Respondent appeals.[4]
II. Analysis
A. Respondent's Constitutional Rights
Respondent first argues that the trial court violated her constitutional rights by concluding that guardianship was in James's best interest without making findings that respondent was unfit or acted in a manner inconsistent with her constitutionally protected status. We disagree.
Respondent is correct that the Due Process Clause protects a "parent's paramount constitutional right to custody and control of his or her children[,]" and that "the government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody, or where the parent's conduct is inconsistent with his or her constitutionally protected status[.]" Adams v. Tessener , 354 N.C. 57, 62, 550 S.E.2d 499, 503 (2001) (citations omitted). "While this analysis is often applied in civil custody cases under Chapter 50 of the North Carolina General Statutes, it also applies to custody awards arising out of juvenile petitions filed under Chapter 7B." In re D.M. , 211 N.C.App. 382, 385, 712 S.E.2d 355, 357 (2011) (citation omitted). Thus, in order "to apply the best interest of the child test in a custody dispute between a parent and a nonparent, a trial court must find that the natural parent is unfit or that his or her conduct is inconsistent with a parent's *122 constitutionally protected status." In re B.G. , 197 N.C.App. 570, 574, 677 S.E.2d 549, 552 (2009) (citations omitted).
However, respondent did not raise this issue during any portion of the permanency planning hearing. This Court has previously held that a parent's right to a determination of his or her constitutionally protected status is waived if the parent does not raise the issue before the trial court. See In re T.P., 217 N.C.App. 181, 186, 718 S.E.2d 716, 719 (2011) (declining review of the respondent-mother's argument that the trial court erred in applying the best interest standard because "constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal" (internal quotation marks, brackets, and citation omitted)). Consequently, respondent has failed to preserve *651 this issue, and her argument is overruled.
B. Guardianship
1. Best Interest of James
Respondent next contends that the trial court erred by concluding that guardianship was in James's best interest. We disagree.
"Appellate review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and the findings support the conclusions of law." In re J.C.S. , 164 N.C.App. 96, 106, 595 S.E.2d 155, 161 (2004) (citation omitted). "We review a trial court's determination as to the best interest of the child for an abuse of discretion." In re J.H. , --- N.C.App. ----, ----, 780 S.E.2d 228, 238 (2015) (citation and internal quotation marks omitted).
Respondent contends that the trial court's conclusion that guardianship was in James's best interest is not supported by its findings that respondent was "not acting in a manner inconsistent with the health or safety of the juveniles" and was
now making progress under her [Family Services Agreement]. [Respondent] looks clean, has continued to attend her visitation, and remains employed. [Respondent] is in a much better place than she was in the Fall. [Domestic violence] has not been addressed yet but there have been no further incidences. There were issues with [respondent] and [the juveniles' maternal grandmother]. [Respondent] continues to look for alternative housing. She recently had a car accident and is attempting to get a new vehicle.
*123 Respondent asserts that these findings cannot be reconciled with the trial court's conclusion; however, the court's findings cannot be considered in isolation. The trial court also found that respondent's children had been in YFS custody for nearly three years, and that James had been placed with Mr. Outing for ten months "and has a good relationship" with him. Even considering respondent's recent progress, the court found that it was still "not possible for [James] to be returned home immediately or within 6 months nor [wa]s it in [his] best interest to return home because: [t]he parents have failed to alleviate the issues that necessitated placement." The court further found that at this time, James's "return to [his] home is contrary to [his] health and safety." Although respondent claims that these findings were not supported by competent evidence, they were wholly consistent with the social worker's testimony at the permanency planning hearing:
Q And would you say that based on everything that you know in this case that it's not foreseeable for these children to be placed with [respondent] within the next six months?
A Yes.
Q Why is that?
A Well, we actually want to see, you know, more progress in her case plan. Although, you know, she's done well, you know, she's come along, we want her as far as getting housing, stable housing, as well as completing the NOVA program.
Respondent had not completed the NOVA program. This program was meant to address respondent's domestic violence issues, which not only were the initial grounds for removing respondent's children from her care but also remained unresolved nearly three years later. The evidence presented by the social worker was sufficient to support the challenged findings, which in turn support the trial court's conclusion. Therefore, contrary to respondent's argument, the findings regarding her progress do not contradict the findings that it was not in James's best interest to return home, but instead reflect that the trial court considered her progress in making its ultimate determination.
Considering the totality of the court's findings, we hold that the trial court did not abuse its discretion in concluding that guardianship was in James's best interest. This argument is overruled.
*124 2. Verification of Mr. Outing's Resources
Finally, respondent argues that the trial court failed to verify that Mr. Outing *652 had "adequate financial resources" before appointing him as guardian to James. We disagree.
Before placing a juvenile in a guardianship, the trial court must verify that the proposed guardian "understands the legal significance of the appointment and will have adequate resources to care appropriately for the juvenile." N.C. Gen. Stat. § 7B-600(c) (2015) ; see also N.C. Gen. Stat. § 7B-906.1(j). "The court may consider any evidence, including hearsay evidence ..., or testimony or evidence from any person that is not a party, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen. Stat. § 7B-906.1(c). "[T]he trial court need not make any specific findings in order to make the verification under these statutory provisions[, b]ut the record must contain competent evidence of the guardians' financial resources and their awareness of their legal obligations." In re J.H. , --- N.C.App. at ----, 780 S.E.2d at 240 (internal quotation marks and citations omitted) (holding that verification was insufficient where the guardian-grandparents did not testify at the hearing and the only evidence of their financial resources was (1) a DSS report stating that they had been "meeting [the child's] medical needs"; and (2) a guardian ad litem report stating that the child had "no current financial or material needs"); see also In re P.A. , 241 N.C.App. 53, 61-62, 772 S.E.2d 240, 246 (2015) (explaining that "some evidence of the guardian's 'resources' is necessary as a practical matter, since the trial court cannot make any determination of adequacy without evidence").
In the instant case, the trial court found that Mr. Outing "stands ready and able to accept the guardianship of [James]. [He] understands the legal significance of the appointment and has adequate resources to care appropriately for [James]." Prior to naming him guardian, the court discussed the significance of the appointment with Mr. Outing:
THE COURT: In regards to guardianship, Mr. Outing, ... you understand that if I appoint or if I give you guardianship of [James] the big thing is, in essence, you're going to be mainly the one financially responsible for [him]. Do you understand that?
MR. OUTING: Yes.
THE COURT: Okay. And you're willing to accept that responsibility as far as the main financial provider for the child?
*125 MR. OUTING: Yes.
THE COURT: Do you also understand that if I appoint giving you guardianship you would have care, custody and control of the juvenile and may arrange for a suitable placement for the juvenile. Do you understand that?
MR. OUTING: Yes.
THE COURT: Do you also understand that you may represent the juvenile in legal actions before any court?
MR. OUTING: Yes.
THE COURT: All right. Do you also understand that you may consent to certain actions on the part of the juvenile in place of the parent or custodian including marriage, enlistment in the armed forces and/or enrollment in school?
MR. OUTING: Yes.
THE COURT: Do you also understand that you may consent to any necessary remedial psychological, medical or surgical treatment for the juvenile?
MR. OUTING: Yes.
...
THE COURT: All right. I think the other orders continue to demonstrate as far as Mr. Outing's care of [James] in the past ten months that I think it's in the best interest of [James] that guardianship be awarded to Mr. Outing.
This colloquy, standing alone, is insufficient to meet the statutory verification requirement. "No doubt, had the trial court asked respondent the same question[s], she also would have said 'yes,' but her answer[s] alone would not have been sufficient evidence of her actual resources or abilities to care for [James] either." Id. at 65, 772 S.E.2d at 248.
Notably, however, the trial court also considered reports from YFS and the guardian ad litem , which establish that Mr. Outing provides James with a stable, YFS-approved *653 home where James has his own bedroom, toys, and a TV. James "appears to be happy and safe" there, and he has "responded positively" to the "structure and consistency" that Mr. Outing provides. Since moving in with Mr. Outing, James's prior behavioral issues have decreased, and he has transitioned in to a normal public school. Mr. Outing takes James to all of his many medical, dental, and *126 therapy appointments. In the future, he plans to enroll James in "some sporting activities outside of the home." See In re J.E., B.E. , 182 N.C.App. 612, 617, 643 S.E.2d 70, 73 (concluding that verification was sufficient where the trial court considered a DSS home study reporting, inter alia , that the guardian-grandparents were "aware of the importance of structure and consistency in a child's life" and were "financially capable of providing for the needs of their grandson"), disc. review denied , 361 N.C. 427, 648 S.E.2d 504 (2007).
Respondent contends that "the record ... raises serious doubts as to whether Mr. Outing has adequate resources to serve as guardian" because he was laid off for a short time around March 2016, prior to the appointment. Nevertheless, in her court report for the 19 April 2016 hearing, the guardian ad litem stated that she believed that Mr. Outing "is now working with a moving company." Moreover, in seeking benefits from Temporary Assistance for Needy Families during his brief period of unemployment, Mr. Outing demonstrated that he appreciated the financial burden of caring for James and wanted to prepare for it.
Furthermore, at the adjudication and disposition hearing on 18 September 2013, Mr. Outing presented evidence that he had been James's primary caretaker for approximately two years before YFS obtained custody of him while Mr. Outing was temporarily away for work. From June 2011 to June 2013, Mr. Outing alone consistently provided James with food, clothing, and other necessities. The trial court incorporated Mr. Outing's motion to intervene and the corresponding order into the findings of its dispositional order.
We have held that "a trial court may take judicial notice of earlier proceedings in the same cause and that it is not necessary for either party to offer the file into evidence" in order to do so. In re M.N.C. , 176 N.C.App. 114, 120, 625 S.E.2d 627, 632 (2006) (citation, brackets, and internal quotation marks omitted). Here, the trial court did not expressly indicate that it was taking judicial notice of prior orders entered in the cause. While "the better practice would be to explicitly ... announc[e] in open court that it is taking judicial notice of the matters contained in the court file[,]" the court was not required to give such notice. Id. at 121, 625 S.E.2d at 632.
"The trial court has the responsibility to make an independent determination, based upon facts in the particular case, that the resources available to the potential guardian are in fact 'adequate.' " In re P.A. , 241 N.C.App. at 65, 772 S.E.2d at 248 (citation and brackets omitted). Considering Mr. Outing's long, close relationship with James; his *127 willingness to intervene in the proceedings; and the undisputed evidence of his demonstrated ability to fully provide for his grandson, we are satisfied with the court's determination in this case. The trial court's permanency planning order is affirmed.
AFFIRMED.
Judges INMAN and ZACHARY concur.

Pseudonyms are used to protect the identities of the minor children involved in this case and for ease of reading.

James's father is deceased.

The order also addressed the status of James's half-siblings. However, respondent's appeal only pertains to the portion of the order granting guardianship of James to Mr. Outing.

On 16 May 2016, the trial court amended its 9 May 2016 order to schedule the next hearing for 6 July 2016; all other terms of the original order remain unchanged. On 8 June 2016, respondent entered notice of appeal from the original order. To the extent that respondent should have appealed from the amended order, we construe respondent's appeal as a petition for writ of certiorari and proceed to its merits. See N.C.R. App. P. 2, 21.